Sealed
Public and unofficial staff access
to this instrument are
prohibited by court order

United States Courts
Southern District of Texas
FILED

*September 5, 2024*

Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **v.** | § | **Criminal No.** _____ |
| | § | **UNDER SEAL** |
| **SHELDON DOUNN,** | § | |
| | § | |
| **Defendant.** | § | |

**4:24-cr-478**

## INDICTMENT

The Grand Jury charges:

## GENERAL ALLEGATIONS

At all times material to this Indictment, unless otherwise specified:

### Introduction

1.     The defendant, **SHELDON DOUNN**, was a South Florida-based pharmaceutical sales representative—a "broker"—who earned sales commissions from selling potent opioids and other commonly abused pills, on behalf of drug distributors, to pharmacies.

2.     **SHELDON DOUNN**'s pharmacy customers were independent pharmacies that **SHELDON DOUNN** knew and understood purchased opioids and other commonly abused pills to unlawfully sell and distribute them (to "divert" them) onto the black market. Most of **SHELDON DOUNN**'s pharmacy customers were located within around 50 miles of Houston, Texas. A few others were in Florida. Both areas were known by **SHELDON DOUNN** and his drug distributors to be diversion "hot zones."

3.     To maximize profit and minimize risk, **SHELDON DOUNN** and his drug distributors followed what **SHELDON DOUNN** referred to as the "model"—a "blueprint" for

staying "under the radar" of regulators and law enforcement, while making **SHELDON DOUNN** and the distributors a "lot of money" and giving them "longevity."

4.      The "model" involved over-market prices to be paid by the pharmacies, low purchasing limits on the drugs of abuse, and purported compliance measures undertaken strictly for appearances. In this way, **SHELDON DOUNN**, his drug distributors, and others made millions funneling drugs of abuse to pharmacies that, as **SHELDON DOUNN**, his drug distributors, and others knew, distributed and dispensed outside the usual course of professional practice and without any legitimate medical purpose, and by other means not authorized by law.

**<u>Distributors' Obligations Under the Controlled Substances Act</u>**

5.      The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. Under the CSA, it was unlawful for any person to knowingly or intentionally manufacture, distribute, or dispense a controlled substance, "except as authorized" under Title 21, United States Code.

6.      The Drug Enforcement Administration ("DEA") enforced the CSA and its implementing regulations by, among other things, approving registrations for manufacturers and distributors of controlled substances. A DEA registration authorized transactions within the legitimate distribution chain. Manufacturers, distributors, or other individuals registering with the DEA were referred to as "registrants."

7.      The DEA performed its distributor-related oversight functions by conducting audits and inspections, reviewing sales data and suspicious order reports, and bringing enforcement actions against registrants that failed to comply with the CSA. A distributor was not authorized under the CSA to distribute or dispense controlled substances unless it maintained "effective control[s] against diversion of particular controlled substances into other than legitimate medical,

2

scientific, research, or industrial channels." *E.g.*, 21 U.S.C. § 823(b)(1); *see also* 21 C.F.R. § 1301.71(a).

8.     In addition, the Attorney General's implementing regulations under the CSA required each distributor to design and operate a system to identify suspicious orders of controlled substances, and to report suspicious orders to the DEA. *See* 21 C.F.R. § 1301.74(b). Suspicious orders included "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." *Id.*

9.     The CSA assigned controlled substances to one of five schedules (Schedule I, II, III, IV, or V) depending on their potential for abuse, likelihood of physical or psychological dependency, accepted medical use, and accepted safety for use under medical supervision. Any registrant that received controlled substances with the highest potential of abuse out of the drugs with currently accepted medical uses in treatment in the United States—*i.e.*, those assigned to Schedule II—had to issue a DEA Form 222 to the registrant supplying the drugs. 21 U.S.C. § 828.

10.     It was unlawful for any person to use a DEA Form 222 to obtain "controlled substances for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research." *Id.* § 828(e). Conversely, it was unlawful for a registrant to distribute a Schedule II controlled substance to any person who the registrant knew or intended was obtaining the controlled substance for any purpose other than their use, distribution, dispensing, or administration in the conduct of a lawful business in such substances or in the course of the person's professional practice or research in the course of his legitimate business. *See* 21 U.S.C. § 843(a)(1).

11.     Just as distributors could sell controlled substances to one another, and to pharmacies, when authorized to do so by law, an appropriately licensed and registered pharmacy was authorized to dispense a controlled substance to a patient, but only pursuant to a valid prescription issued for a legitimate medical purpose by a doctor or other practitioner acting in the usual course of professional practice. 21 C.F.R. §§ 1306.04, 1306.06.

### The Greater Houston Area

12.     The greater Houston area ("the Houston area") included the following counties in the State of Texas: Austin, Brazoria, Chambers, Fort Bend, Galveston, Harris, Liberty, Montgomery, and Waller.

13.     The Houston area was a nationally recognized diversion hot zone.

### The Commonly Abused Prescription Drugs

14.     The following controlled substances in Schedule II were most often diverted onto the Houston area's black market:

    a.    Hydrocodone was an opioid classified as a Schedule II controlled substance. Hydrocodone was a narcotic analgesic used to treat moderate to moderately severe pain and, like other opioids, was among the most addictive drugs used in medicine. The highest-strength quick-release hydrocodone pill commercially available—and the one most in demand on the Houston area's black market—contained 10 mg of hydrocodone bitartrate and 325 mg of the non-narcotic analgesic acetaminophen. Hydrocodone 10-325 mg combination pills typically had a Houston area street value of around $1 per milligram.

    b.    Oxycodone was an opioid classified as a Schedule II controlled substance. Oxycodone was a more powerful narcotic painkiller than hydrocodone, having twice hydrocodone's potency per milligram. The highest-strength short-acting oxycodone pill commercially available—and the one most in-demand on the Houston area's black market—contained 30 mg of oxycodone hydrochloride. The oxycodone combination pill containing 10 mg of oxycodone hydrochloride and 325 mg of acetaminophen was high in demand on Houston area's black market. The street value of oxycodone's 30 mg and 10-325 mg pills was approximately $1 per milligram.

    c.    Hydromorphone was an opioid classified as a Schedule II controlled substance. Hydromorphone was a more powerful narcotic painkiller than oxycodone, typically

prescribed when other medication was unsuccessful. The highest-strength short-acting hydromorphone pill commercially available—and the one most in-demand on the Houston area's black market—contained 8 mg of hydromorphone hydrochloride.

(Collectively, the Schedule II opioids in the strengths described are the "Commonly Abused Opioids.")

15.     In addition to the Commonly Abused Opioids, the following controlled substances were also frequently diverted onto the Houston area's black market:

    a.  Carisoprodol was a Schedule IV controlled substance classified as a muscle relaxant. The highest-strength carisoprodol pill commercially available—and the one most in-demand on the Houston area's black market—was the 350 mg pill. Carisoprodol 350 mg typically sold on the street for $5 or more per pill.

    b.  Alprazolam was a Schedule IV controlled substance used to treat anxiety. The highest-strength alprazolam pill commercially available—and the one most in-demand on the Houston area's black market—was the 2 mg pill. The street value of alprazolam 2 mg pills was typically $5 or more.

    c.  Promethazine with codeine was a Schedule V controlled substance classified as a cough suppressant. The street value of a pint of promethazine with codeine syrup was $1,000 or more.

(Collectively, carisoprodol, alprazolam, and promethazine with codeine are "Potentiators," so-called for their reputation on the black market of enhancing the high from the Commonly Abused Opioids.) (Together, the Commonly Abused Opioids and Potentiators are the "Commonly Abused Prescription Drugs.")

### Diversion of the Commonly Abused Prescription Drugs

16.     **SHELDON DOUNN**'s pharmacy clients unlawfully distributed and dispensed the Commonly Abused Prescription Drugs using different schemes, including:

    a.  "Traditional" operations, which required individuals to pose as patients to show up, in person, to receive illegitimate prescriptions from complicit doctors and then travel to complicit pharmacies to fill them;

    b.  "Counterfeit-prescription" operations, which involved drug trafficking organizations forging prescriptions and identification cards, bringing them to a

complicit pharmacy in bulk, and paying large sums of cash for batches of the drugs; and

c. "Back door" or "ghosting" operations—known to law enforcement as "ghosting" pharmacies—eliminated doctors, patients, and prescriptions altogether and instead relied on established relationships with complicit distributors and their representatives to order as many of the Commonly Abused Prescription Drugs as possible and sold the drugs in bulk, directly to drug traffickers, before shuttering the pharmacy and repeating the process.

17.     Pharmacies engaging in "traditional," "counterfeit-prescription," or "back door" methods of diversion were known as "pill-mill pharmacies" or "pill mills."

18.     As **SHELDON DOUNN** and his distributors were aware, **SHELDON DOUNN**'s pharmacy customers exhibited numerous "red flags" of diversion, many of which were enumerated by the Texas State Board of Pharmacy ("TSBP") in *Red Flags Check List for Pharmacies, YOU MIGHT BE A PILL MILL IF….*, which TSBP regularly distributed to Texas pharmacies:

a. filling a reasonably discernible pattern of substantially identical prescriptions for the same controlled substances or combinations of controlled substances;

b. routinely filling prescriptions for known drugs of abuse, alone or in combination, including opioids, benzodiazepines (like alprazolam), and muscle relaxants;

c. routinely filling prescriptions for the highest strength and/or for large quantities of these drugs;

d. charging above-market rates and accepting mostly/only cash or credit (instead of insurance) for known drugs of abuse; and

e. routinely ordering controlled substances from more than one drug supplier.

## DEFENDANT AND RELEVANT ENTITIES AND INDIVIDUALS

19.     Defendant **SHELDON DOUNN** resided in Plantation, Florida. **SHELDON DOUNN** did business from his home or single-room office there, under his Florida-based limited liability company, Pharmacy Rx Consultants LLC ("PRC"). **SHELDON DOUNN** was PRC's Manager, Registered Agent, and sole employee, and the sole signatory on PRC's bank account ("PRC Account").

20.      Wholesale Rx d/b/a Tyler Pharmaceuticals ("Wholesale Rx") was a Tennessee corporation established on or about May 21, 2013. In exchange for brokering the sales of Commonly Abused Prescription Drugs between Wholesale Rx and his pharmacy customers, Wholesale Rx paid **SHELDON DOUNN** (through PRC) a commission, usually a percentage of the sales he brokered. **SHELDON DOUNN** also handled Wholesale Rx's procurement (from manufacturers or other distributors) of the Commonly Abused Prescription Drugs that Wholesale Rx sold to **SHELDON DOUNN**'s pharmacy customers.

21.      Wholesale Rx's management included Dick Osborne and Courtney Rotenberry. Beginning no later than April 2015, Osborne served as President of Wholesale Rx. Rotenberry joined the company in a clerical role in or around 2019, and then assumed a sales and account management role in or around August 2020, when her duties expanded to handling the company's "house" accounts—those not serviced by **SHELDON DOUNN**—and managing day-to-day operations, including "compliance" and logistics.

22.      **SHELDON DOUNN** served as a sales representative for other distributors in addition to Wholesale Rx. As a subcontractor for Broker Group A, **SHELDON DOUNN** facilitated sales on behalf of Wholesaler D out of Maryland and Wholesaler E out of California. **SHELDON DOUNN** also occasionally received payment from Broker Group B for referring pharmacy clients to Salus Medical LLC ("Salus") out of Arizona (collectively, Wholesale Rx, Salus, and Wholesalers D and E are the "Dounn Distributors").

23.      **SHELDON DOUNN** served as Wholesale Rx's direct sales representative for the Houston-area pharmacies below, some of which also purchased Commonly Abused Prescription Drugs, through **SHELDON DOUNN** and others, from Salus, Wholesaler D, and Wholesaler E:

     a.   <u>Golden USA Pharmacy</u> ("Golden"), a counterfeit-prescription pill-mill pharmacy in the Houston area owned and operated by Frank Nwabugwu;

7

     b.   <u>Creative Care Pharmacy</u> ("Creative Care"), a traditional pill-mill pharmacy in the Houston area owned and operated by Keisha Harris;

     c.   <u>Prucare Pharmacy ("Prucare") and HMR Pharmacy ("HMR")</u> (the "Reid Pharmacies"), traditional pill-mill pharmacies in the Houston area utilized by drug traffickers, including Andre Reid, to obtain Commonly Abused Prescription Drugs;

     d.   <u>K Med and Aldine Family Pharmacy ("Aldine")</u> (collectively, the "Griffin Pharmacies"), back-door pill-mill pharmacies in the Houston area utilized by drug traffickers, including Velencia Griffin, to obtain Commonly Abused Prescription Drugs; and

     e.   <u>NA Pharmacy</u>, a back-door pill-mill pharmacy in the Houston area owned and operated by Kendal Lyons.

24.    **SHELDON DOUNN** also facilitated sales for Wholesalers D and E (through Broker Group A) and Salus (through Broker Group B), for Florida pharmacy customer:

     a.   <u>Pharmacy Partnership d/b/a Neighborhood Pharmacy</u> ("Neighborhood"), a back-door pill-mill pharmacy in Boynton Beach, Florida, owned and operated by Casey Kelleher.

(Collectively, Golden, Creative Care, the Reid Pharmacies, NA Pharmacy, the Griffin Pharmacies, and Neighborhood are the "Dounn Pharmacies.")

## <u>SHELDON DOUNN'S RELATIONSHIPS WITH THE DOUNN DISTRIBUTORS WERE MUTUALLY BENEFICIAL</u>

25.    For the Dounn Distributors, retaining **SHELDON DOUNN** meant securing his book of Houston-area pharmacy customers willing to pay over-market prices for Commonly Abused Prescription Drugs; access to **SHELDON DOUNN**'s established business relationships with manufacturers and other suppliers of the Commonly Abused Prescription Drugs that the Houston-area pharmacy customers wanted; and reaping the benefits of **SHELDON DOUNN**'s experience with the "model"—**SHELDON DOUNN** would tell the pharmacy customers when on-site inspections were scheduled; coach them on how to answer questions on applications or fill out DEA Forms 222 so as not to attract the DEA's attention; and keep tabs on the market's preferences related to the Commonly Abused Prescription Drugs, including preferred colors and brands.

26.     For example, in January 2021, **SHELDON DOUNN** advised Wholesale Rx's Courtney Rotenberry to buy as much blue oxycodone 30 mg as possible because "right now, the blue is the beast." One of **SHELDON DOUNN**'s Houston-area pharmacy customers confirmed this in March 2021, explaining to **SHELDON DOUNN** that customers would buy oxycodone 30 mg pills "as long as they see a blue small one . . . they don't . . . know . . . the brand name, or whatever." **SHELDON DOUNN** agreed: "I know. And that's what we go for. Blue. Support blue. Go blue."

27.     Additionally, **SHELDON DOUNN** gave the Dounn Distributors someone to blame—a layer of insulation from their pill-mill customers—in the event of scrutiny. For those benefits, the Dounn Distributors paid **SHELDON DOUNN** sizeable commissions on the sales he facilitated. The following table depicts funds deposited into **SHELDON DOUNN**'s PRC Account, made on behalf of Wholesale Rx; Wholesalers D and E (with **SHELDON DOUNN** working as a subcontractor for Broker Group A); and Salus (with **SHELDON DOUNN** conducting that business through Broker Group B). In all, Wholesale Rx, Broker Group A, and Broker Group B deposited over $1 million into the PRC Account during the timeframe depicted:

| Payment Source | Incoming Funds | First Deposit | Most Recent Deposit |
|---|---|---|---|
| **Wholesale RX** | **$621,489.93** | **04/29/16** | **05/28/21** |
| **Broker Group A** | **$408,710.14** | **08/27/15** | **05/28/21** |
| **Broker Group B** | **$28,734.01** | **04/19/18** | **05/04/21** |
| **Total** | **$1,058,934.08** | | |

28.     **SHELDON DOUNN** benefited from his arrangements with the Dounn Distributors in more ways than just financially. As an independent, out-of-state sales representative,

**SHELDON DOUNN**'s name stayed off the paperwork most likely to be reviewed by regulators and law enforcement; he never touched the drugs; he never visited the pharmacies; and he could blame the Dounn Distributors' compliance personnel, located in another state, in the event of scrutiny.

29.     Also, **SHELDON DOUNN**'s status as an independent sales representative meant he could facilitate sales of Commonly Abused Prescription Drugs from more than one distributor, which made him more money on his pharmacy customers and ensured that if one of the Dounn Distributors could not or would not sell, **SHELDON DOUNN** could sell through another.

### Wholesale Rx

30.     Wholesale Rx was **SHELDON DOUNN**'s primary source of Commonly Abused Prescription Drugs for Houston-area pharmacy customers. **SHELDON DOUNN** was the company's lead sales representative, and he used his industry connections to ensure that Wholesale Rx stocked the Commonly Abused Prescription Drugs that **SHELDON DOUNN**'s pharmacy customers wanted.

31.     **SHELDON DOUNN** did not have, and did not want, any ownership interest in Wholesale Rx. But—as he frequently reminded Dick Osborne, Courtney Rotenberry, and the company's employees—**SHELDON DOUNN** brought the "model" to Wholesale Rx, and he was the company's authority on implementing it. For example, in a December 2019 email, **SHELDON DOUNN** recalled to Rotenberry how he "started this distributorship with Dick [Osborne]. Sourced out the vendors specific to our needs to accomplish the highest margins of distributing generic medications." He continued, "This is **all about making money without investing millions of dollars in inventory** . . . . Again, this specialty market is a **completely** different animal. Not for the un-trained rookie" (emphases in original).

32.     In April 2021, **SHELDON DOUNN** explained to Dick Osborne how he (**SHELDON DOUNN**) helped Wholesale Rx move unwanted non-controlled substances and ensured pharmacy customers complied with the "model" by picking their non-controlled drugs for them. **SHELDON DOUNN** reminded Osborne that they would "make a lot of money" if they "stay[ed] off the radar":

> Can I tell you the truth? My orders… It's a simple… I make the orders. I create 'em. All they [the pharmacies] tell me is, "Sheldon, do I have any lines [on a DEA Form 222] left for hydrocodone?" . . . [I tell them,] "Yes, you do." So, [the pharmacy says,] "All right. Send me four [bottles]." [And I say to the pharmacy,] "All right."
>
> So that's 2,000 [Commonly Abused Prescription Drug pills]… then I [have to] create 8,000 non[-controlled pills]…So, **I go up and down the inventory… I get rid of short dates. I get rid of stuff that's near the end… one of [this], two of [that]… and then I look at how much we [Wholesale Rx has] got a lot of. . . . Let's say, uh… HCTZ. We have thirty-eight bottles. So, I'll move some of that.**
>
> But . . . **if we were to let the regular Houston customers [handle ordering non-controlled drugs to meet ratio] . . . [and] I'm not talking about Pennsylvania or upstate [pharmacies]. . . . In Houston… this business model that I brought to you… [Pharmacies] would not . . . meet ratio…** [or if they did, they would just] **buy . . . the same crap every week. And that . . . doesn't look good** (emphases added).

In response to **SHELDON DOUNN**'s suggestion that buying "the same crap every week" did not "look good," Osborne agreed, "No, it doesn't." **SHELDON DOUNN** continued, "My thing with you [is], **[w]e can make a lot, a lot of money if we stay under the radar**" (emphasis added).

33.     **SHELDON DOUNN** had experienced Houston-area pharmacies complaining about Wholesale Rx's ratio requirement. For example, In January 2021, **SHELDON DOUNN** received a text message from Courtney Rotenberry that one of **SHELDON DOUNN**'s Houston-area customers was "complaining bc [because] they only wanted controls not the other products LOL [laughing out loud]." The following day, **SHELDON DOUNN** explained to the operator of the pharmacy that Wholesale Rx sent her "some ratio items [after w]e sent you some controls. I

thought that was like, pretty much understood." It was also not uncommon for **SHELDON DOUNN** to receive calls and text messages from his Houston-area pharmacy customers like the following one, from February 2021, where the operator of a Houston-area pharmacy complained that "[y]ou gave me an excess of non[-controlled substances] last time, I need you to apply it now to this order and let me know how much [sic] non control [sic] to get."

34.     In trying to stay under the radar, **SHELDON DOUNN** was quick to express his frustration when he thought Wholesale Rx's employees or its practices fell short of the "model." In a March 2018 email to Dick Osborne, **SHELDON DOUNN** complained about another sales representative's "LUDACRIS [sic]" sale of more oxycodone at once than **SHELDON DOUNN** deemed wise, threatening that "If you want this business we have going, to last for the long term – YOU will listen to me. I just cannot believe…. I have customers that would LOVE TO BUY ALOT AT ONE TIME. [T]here is no way, no way I would do that. . . . WE ARE 1 MISTAKE AWAY FROM GETTING SHUT DOWN !!!!!!!!!!!!!!!!!!!!!!!!!!!!!! Wake UP Dick" (all-caps in original).

35.     In another email from **SHELDON DOUNN** to Dick Osborne and Courtney Rotenberry, among others, from February 2020, **SHELDON DOUNN** acknowledged that Wholesale Rx was "not my business," but pointed out that "it is **my blueprint** of making real money with unusually high margins on everyday meds" (emphasis in original). **SHELDON DOUNN** proceeded to criticize that the order (a) exceeded limits; (b) underpriced hydrocodone 10-325 mg, which "**sells for $299.00 - $359.00 in Texas. (NOT $219)**" (emphasis in original); (c) was "**6,000 PILLS SHORT of Ratio**" (emphasis in original); and (d) priced non-controlled substances "**UNDER market [in Texas]**" (emphasis in original). **SHELDON DOUNN** concluded, "If [l]eaving money on the table is OK with Tyler > it's OK with me," but "[t]hey

[Houston-area pharmacies] are laughing at Tyler Pharmaceuticals [Wholesale Rx] or blessing the Lord to receive such low prices."

36.     In October 2020, after **SHELDON DOUNN** found out about another Wholesale Rx representative contacting **SHELDON DOUNN**'s old customers, "call[ing] them. [E]mail[ing] them whatever…. [Telling them] 'we want you back[,]'" **SHELDON DOUNN** warned Dick Osborne,

> I would not encourage or allow that. . . . **I don't want her, or anyone to call MY old accounts. This model does not support that. Why ?? Because I don't want the FEDS questioning me, on the phone or in person. I don't think you do either. . . . They [the old pharmacy customers] went down quickly. POOF gone** (emphases in original).

37.     The owners and longer-term employees at Wholesale Rx were aware of arrests of Houston-area customers. For example, after a coordinated law enforcement action in Houston in late August 2019 resulted in search warrants and arrests at several of Wholesale Rx's Houston-area pharmacy customers, **SHELDON DOUNN** asked another Wholesale Rx employee to "[c]all me when you can talk freely about this." The other employee responded, "We've both been in this business long enough to know that the DEA doesn't play. They are out for blood here." The other employee continued, "I'm telling you I hate it but I believe it's going to shut us down."

38.     A month after that exchange, **SHELDON DOUNN** stressed to the same employee and two others that "[t]he business we are doing in Texas, specifically in Houston and surrounding areas are [sic] different from other independent pharmacies in other areas. Let me explain. When a pharmacy stops buying from Tyler [Wholesale Rx] the reasons are few . . . ." **SHELDON DOUNN** expounded, "When they stop buying the No. 1 reason is they either got shut down OR lost their control license[,] . . . [or t]here is a new owner and[/]or pharmacist where they *no longer* will distribute controls in the fashion they used too [sic] nor will they pay are [sic] **inflated** non-control prices and will no longer pay for **shipping**." (emphases in original). **SHELDON DOUNN**

reminded them that as "[r]ecently as in 2 – 3 weeks ago more than [sic] **nearly a dozen** pharmacies were cited and shut down." In the same email, **SHELDON DOUNN** opined that "[t]he businessmen there [in Houston] know Tyler [Wholesale Rx] (me) and when and if, they re-open and re-locate, they will reach out."

39.     **SHELDON DOUNN** was also careful not to compromise Wholesale Rx's sources of supply of Commonly Abused Prescription Drugs, which **SHELDON DOUNN** knew and regularly emphasized were the lifeblood of the company. In a May 2020 email, **SHELDON DOUNN** described to Dick Osborne and Courtney Rotenberry the "other strengths of oxycodone" besides 30 mg as "more 'window dressing' if anything else as to not just have the most popular 30 mg," reminding them to keep "**in mind…. 30mg is the jewel of jewels**" (emphasis in original). In another email to Rotenberry from December 9, 2020, **SHELDON DOUNN** explained that "[w]e live by C2's [sic], where the C3's to C5 are gravy toppings." Elsewhere, **SHELDON DOUNN** described to Osborne how securing Commonly Abused Opioids for Wholesale Rx from suppliers was part of "what I need to do to keep the golden nuggets coming our way," describing those drugs as "**bait** to bring on new customers as well" (emphasis in original).

40.     In an email to Wholesale Rx's management in August 2020, **SHELDON DOUNN** warned that once one of Wholesale Rx's suppliers "see[s] our [distribution] report they will cut us off. 100% They have done this to another distributor once they found out their meds were being distributed in Texas, particularly in the Houston area," concluding that email with "*Please delete this email after reading*" (emphasis in original). In an email to Courtney Rotenberry from December 2020, **SHELDON DOUNN** warned Rotenberry, "I try to be so careful with [Supplier B] as not to be labeled as a 'oxy distributor' or a 'control based company.' Should that surface, they will cut us off (C2's) [sic] in a NY second." In the same email, **SHELDON DOUNN**

14

characterized the non-controlled substances Wholesale Rx bought from Supplier B as "small amounts of cheap creams and suspension powders – just window dressing and not of need."

41.     Wholesale Rx's focus on selling the Commonly Abused Prescription Drugs to Houston-area pharmacies is reflected in the chart below, which shows that from on or about July 31, 2013, through on or about December 31, 2021, more than 97% of the Schedule II controlled substances that Wholesale Rx supplied Houston-area pharmacies from Wholesale Rx's place of business in Tennessee, were Commonly Abused Opioids—just the three of those drugs, in one strength apiece:

**Commonly Abused Opioid Pills Wholesale Rx Sold to Houston Area Pharmacies**
**2013 Through 2021**

|  | 2013-2017 | 2018 | 2019 | 2020 | 2021 | Total | % Total |
|---|---|---|---|---|---|---|---|
| Hydrocodone 10-325 mg | 2,122,200 | 102,000 | 280,500 | 509,300 | 582,500 | 3,596,500 | 61% |
| Oxycodone 30 mg | 440,400 | 441,600 | 520,500 | 317,600 | 393,700 | 2,113,800 | 36% |
| Hydromorphone 8 mg |  | 1,000 | 4,800 | 41,400 | 21,400 | 68,600 | 1% |
| Other | 74,400 | 2,600 | 2,000 | 33,300 | 14,100 | 126,400 | 2% |
| Total | 2,637,000 | 547,200 | 807,800 | 901,600 | 1,011,700 | 5,905,300 | 100% |

42.     In addition, although Wholesale Rx was headquartered in Tennessee, Wholesale Rx supplied the Commonly Abused Opioids to pharmacies almost exclusively located in the Houston area. In fact, from on or about July 31, 2013, through on or about December 31, 2021, greater than 96% of Wholesale Rx's hydrocodone 10-325 mg and oxycodone 30 mg pills distributed to pharmacies went to the Houston area. At around $1 per milligram, the street value of the Commonly Abused Opioids that Wholesale Rx distributed into the Houston area during that timeframe was around $99.3 million.

15

**Wholesaler D**

43.     Wholesale Rx sometimes could not or would not supply **SHELDON DOUNN**'s pharmacy clients with Commonly Abused Prescription Drugs—reasons included the pharmacy hitting Wholesale Rx's monthly limits on purchasing, Wholesale Rx running out of the color oxycodone 30 mg the pharmacy wanted, the pharmacy being located outside Texas, or Wholesale Rx cutting off the pharmacy due to nonpayment or word of a DEA investigation.

44.     When that happened, **SHELDON DOUNN** sourced the drugs from other Dounn Distributors. One of those was Wholesaler D, for which **SHELDON DOUNN** facilitated sales as a subcontractor, through Broker Group A. Beginning no later than 2015 and continuing through around late 2019, Wholesaler D employed a "model" virtually identical to the one **SHELDON DOUNN** brought to Wholesale Rx. However, **SHELDON DOUNN**'s sales for Wholesaler D dwindled after Wholesaler D, after learning it was under investigation by the DEA for supplying Houston-area pill mills, hired a third-party compliance company that performed effective due diligence. As **SHELDON DOUNN** explained to a fellow Miami-based broker in February 2021, "the reason why I, I kinda got away from them, J, was because they started getting real weird with, uh… uh, compliance. And… it's like, you know what? Some of these stores, like, didn't wanna comply with that, and then… you know, I just kinda like… you know, shied away, 'cause… most of my time is spent with, you know, [W]holesale [Rx]."

45.     As the chart below illustrates, Wholesaler D's sales of Commonly Abused Prescription Drugs into the Houston area dipped substantially in 2020; however, those sales increased in 2021. From on or about May 31, 2015, through on or about December 31, 2021, more than 98% of the Schedule II controlled substances that Wholesaler D supplied Houston-area

pharmacies from Wholesaler D's place of business in Maryland, were Commonly Abused Opioids—just the three of those drugs, in one strength apiece:

**Commonly Abused Opioid Pills Wholesaler D Sold to Houston Area Pharmacies**
**2015 Through 2021**

|  | 2015-2017 | 2018 | 2019 | 2020 | 2021 | Total | % Total |
|---|---|---|---|---|---|---|---|
| **Hydrocodone 10-325 mg** | 787,400 | 402,900 | 350,400 | 180,400 | 304,700 | 2,025,800 | 58% |
| **Oxycodone 30 mg** | 351,700 | 256,300 | 301,700 | 175,000 | 272,200 | 1,356,900 | 39% |
| **Hydromorphone 8 mg** | 7,100 | 600 | 24,600 | 2,800 | 2,000 | 37,100 | 1% |
| **Other** | 600 | 4,200 | 21,015 | 14,715 | 24,140 | 64,670 | 2% |
| **Total** | 1,146,800 | 664,000 | 697,715 | 372,915 | 603,040 | 3,484,470 | 100% |

46.     Further, although Wholesaler D was headquartered in Maryland, Wholesaler D supplied the Commonly Abused Opioids to pharmacies almost exclusively in the Houston area and known diversion hot zones in Florida. In fact, from on or about May 31, 2015, through on or about December 31, 2021, greater than 91% of Wholesaler D's hydrocodone 10-325 mg pills distributed to pharmacies went to the Houston area.

**Wholesaler E**

47.     In or around February 2020, **SHELDON DOUNN** began facilitating—also through Broker Group A—sales of Commonly Abused Prescription Drugs to **SHELDON DOUNN**'s Houston-area pharmacy customers from Wholesale E, a distributor operating in California. **SHELDON DOUNN** largely used access to Wholesaler E to supplement the Commonly Abused Prescription Drugs he was already supplying his Houston-area customers from Wholesale Rx. In January 2021, **SHELDON DOUNN** described Wholesaler E to a Houston-area pharmacy

17

customer as "more lenient than Tyler [Wholesale Rx]." Within a year of **SHELDON DOUNN**
starting to facilitate sales into Houston on behalf of Wholesaler E, Wholesaler E's total output of
Commonly Abused Opioids nearly tripled.

48.     From on or about January 1, 2020, through on or about January 31, 2022, more than
97% of the Schedule II controlled substances that Wholesaler E supplied Houston-area pharmacies
from Wholesaler E's place of business in California, were Commonly Abused Opioids—just the
three of those drugs, in one strength apiece—as represented in the chart below:

**Commonly Abused Opioid Pills Wholesaler E Sold to Houston Area Pharmacies,**
**January 2020 Through End January 2022**

|  | 2020 | 2021 | Jan-22 | Total | % of Total |
|---|---|---|---|---|---|
| Oxycodone 30 mg | 122,300 | 79,900 | 12,400 | 214,600 | 53% |
| Hydrocodone 10-325 mg | 107,500 | 59,400 | 6,000 | 172,900 | 43% |
| Hydromorphone 8 mg | 7,200 |  |  | 7,200 | 2% |
| Other | 10,000 |  |  | 10,000 | 2% |
| Total | 247,000 | 139,300 | 18,400 | 404,700 | 100% |

49.     Although Wholesaler E was headquartered in California, Wholesaler E supplied the
Commonly Abused Opioids to pharmacies almost exclusively located in the Houston area or
known diversion hot zones in Florida. In fact, from on or about January 2020, through on or about
January 2022, greater than 96% of Wholesaler E's hydrocodone 10-325 mg pills distributed to
pharmacies went to the Houston area.

*Continued on next page…*

## SALES OF COMMONLY ABUSED PRESCRIPTION DRUGS
## FROM THE DOUNN DISTRIBUTORS TO THE DOUNN PHARMACIES

50.     The following is a small sampling of **SHELDON DOUNN**'s pharmacy customers and the Commonly Abused Prescription Drugs they purchased through **SHELDON DOUNN** from the Dounn Distributors, during the timeframes indicated:

### Golden

51.     The owner of Golden, along with several associates, were indicted in the Southern District of Texas in September 2019 for illegally distributing and dispensing Commonly Abused Prescription Drugs. **SHELDON DOUNN** was Golden's sales representative for both Wholesale Rx and Wholesaler D—two of nine secondary wholesalers that sold Golden Commonly Abused Opioids in the years before the arrests.

52.     **SHELDON DOUNN**'s name and number were saved in the cellular phone of Frank Nwabugwu, under "Sheldon WholesaleRx." In voicemails left by **SHELDON DOUNN** on Nwabugwu's phone in 2017, **SHELDON DOUNN** refers to oxycodone 30 mg pills as "30 milligram" pills or "30s." For example, in March 2017, **SHELDON DOUNN** left the following message:

> Hey Frank. Good morning it's Sheldon, Wholesale Rx, [Wholesaler D], you know. Umm . . . Wholesale Rx I can do six bottles of 30 milligram if you want today for tomorrow. Saturday or today for Monday. Six bottles of 30. If you want 12, I can do 12 too. Umm . . . it's the end of the month now and you have availability. 30 milligram. You want 6 you want 12, let me know, and I'll get it over to you. Either for tomorrow Saturday or for Monday. Let me know, Frank. Sheldon.

53.     Wholesale Rx and Wholesaler D supplied Golden the following Schedule II controlled substances, all either oxycodone 30 mg or hydrocodone 10-325mg from May 2015 to September 2018:

| DRUG TYPE | WHOLESALE RX (May 2015 – Sept. 2018) | WHOLESALER D (Aug. 2016 – Mar. 2017) | TOTAL |
|---|---|---|---|
| Hydrocodone 10-325mg | 129,500 | 42,500 | 172,000 |
| Oxycodone 30mg | 56,200 | 15,200 | 71,400 |
| **TOTAL** | **185,700** | **57,700** | **243,400** |

### Creative Care Pharmacy

54.     On January 18, 2018, **SHELDON DOUNN** sent Creative Care's owner, Keisha Harris, a fax in which **SHELDON DOUNN** expressed an interest in being "one of 'your go to' guys" for "allocated medications"—code for Commonly Abused Prescription Drugs. **SHELDON DOUNN** boasted carrying "everyday manufacturers," following the term with names of companies that manufactured Commonly Abused Prescription Drugs.

55.     In August 2019, Harris was arrested in a coordinated law enforcement action targeting pill-mill pharmacies in Houston. This enforcement action was known to **SHELDON DOUNN**, and to other Miami-based brokers, like him, who targeted the Houston area with Commonly Abused Prescription Drugs. In fact, the August 2019 arrests were a topic of conversation for brokers years later, like in a 2021 call where a colleague of **SHELDON DOUNN**'s brought up the "guys that got shut down in 2019, Creative Care and all those, remember?" To which **SHELDON DOUNN** responded, "Yeah, yeah."

56.     Wholesale Rx and Wholesaler D supplied Creative Care the following Schedule II controlled substances, all either oxycodone 30 mg and hydrocodone 10-325mg from May 2018 to July 2019:

| DRUG TYPE | WHOLESALE RX (May 2018 - July 2019) | WHOLESALER D (Nov. 2018 - Mar. 2019) | TOTAL |
|---|---|---|---|
| Hydrocodone 10-325mg | N/A | 5,000 | 5,000 |
| Oxycodone 30mg | 40,400 | 6,200 | 46,600 |
| **TOTAL** | **40,400** | **11,200** | **51,600** |

**The Reid Pharmacies**

57.     Through **SHELDON DOUNN**, Andre Reid—using the pseudonym "James"—purchased Commonly Abused Prescription Drugs for both pharmacies from Wholesale Rx. The name "James" did not appear on any ownership or inspection documents related to the pharmacies.

58.     In August 2019, on the same date that Creative Care's Harris was arrested, agents executed a search warrant at Prucare, effectively shutting it down. A few months after closing Prucare and HMR, Andre Reid told **SHELDON DOUNN** over the phone that Reid was "laying low" and would contact **SHELDON DOUNN** after things cooled off.

59.     In March 2020, in response to an email from Courtney Rotenberry asking **SHELDON DOUNN** to "[p]lease update on status of these customers," **SHELDON DOUNN** said of Prucare: "James['] pharmacy closed down. Prescriptions were found to be fraudulent, yet filled by pharmacy tech.   He did reach out at the end of February to tell me he is relocating and should be open sometime in May. Let's see. We proceed with caution should that happen."

60.     Yet, on June 26, 2020, Andre Reid—again, using the pseudonym "James," called **SHELDON DOUNN** and explained that he ("James") was trying to "monopolize . . . while [the market was] low," by opening "five [pharmacy] locations before the year is over with." "James" only needed to figure out "who I needa put, you know, mm, whose name need to go where." Reid continued, "[t]rynna make sure that we, we were gonna be good and you gon' be able to, you know, hook up my accounts…." **SHELDON DOUNN** responded, "Wow, that's strong. . . . hopefully I can, you know do all five. That'd be great. That'd be great." **SHELDON DOUNN** expressed that he wanted to put "James" with [Wholesaler E], in California," given that, in **SHELDON DOUNN**'s opinion, Wholesale Rx was "going through a little bit of turmoil as far as orders and how many you can order per week, how many per month. And it's becoming like, I

don't know where this came from and I'm trynna find out, but it's ridiculous." **SHELDON DOUNN** further agreed that he would choose for "James" the "cheap" non-controlled substances required to meet Wholesale Rx's and/or Wholesaler E's ratio requirements "like [**SHELDON DOUNN**] used to." In addition, **SHELDON DOUNN** advised "James" to send the application for each pharmacy in a separate email, purportedly to make it easier to send "two different requests right to compliance."

61.     From January 2019 through August 2019, the only Schedule II drugs that Wholesale Rx supplied Prucare and HMR were 18,500 pills of oxycodone 30 mg.

### The Griffin Pharmacies

62.     For a time, **SHELDON DOUNN** sold Commonly Abused Prescription Drugs to both K Med and Aldine from Wholesale Rx, with Velencia Griffin ordering for both pharmacies. In October 2019, Griffin asked **SHELDON DOUNN**, "[C]an you send something out today?" **SHELDON DOUNN** replied, "YES . . . 7 A[m]neal or Al[vo]gen [both blue oxycodone 30 mg pills]?" Griffin responded, "For Aldine I thought you said our limit is 3000." **SHELDON DOUNN** was "[c]onfused... Each form has 7. Figured you wanted 7 today for K Med. . . . You are talking for 2 Pharmacies now - please be explicit." Griffin apologized, "Aldine lol [laughing out loud] sorry." **SHELDON DOUNN** asked, "Does K-Med want an order too ? They have 3 available forms. One is available now dated 10/1 for 7." Griffin responded, "Yes for both but on two different card[s] right? . . . [And w]hat happened to the liquid [slang for Potentiator promethazine with codeine cough syrup]?" **SHELDON DOUNN** replied, "Supposed to  receive Sept 25 then Sept 27 now Oct 4 Friday." Griffin replied, "Ok cool send out . . . [w]hen you get it."

63.     Griffin eventually ceased working with K Med, but she continued to order from **SHELDON DOUNN** for Aldine. In March 2020, **SHELDON DOUNN** told Griffin he "want[ed]

22

to open Aldine with [Wholesaler E]...as a strong supply source.  Promethazine syrups and more[.]"

That never happened: less than two months later, Aldine notified the DEA that it had closed down

with no controlled drugs remaining in inventory—despite never reporting any dispensing to the

State of Texas. In fact, Griffin personally received many of the shipments of Commonly Abused

Pharmaceutical Drugs that she ordered from **SHELDON DOUNN**, and then sold them directly to

drug dealers, sometimes while the drugs were still in the shipping containers.

64.     From January 2018 through April 2020, through **SHELDON DOUNN**, Wholesale

Rx supplied Aldine and K Med, through Griffin, approximately the following numbers of pills of

oxycodone 30 mg, hydrocodone 10-325 mg, and hydromorphone 8mg:

| DRUG TYPE | WHOLESALE RX (Jan. 2018 – Apr. 2020) |
|---|---|
| Hydrocodone 10-325 mg | 54,500 |
| Oxycodone 30 mg | 55,200 |
| Hydromorphone 8 mg | 16,900 |
| **TOTAL** | **126,600** |

**NA Pharmacy**

65.     After Velencia Griffin's departure from K Med, Kendal Lyons began ordering from

**SHELDON DOUNN** on K Med's behalf. In September 2020, Kendal Lyons sent **SHELDON**

**DOUNN** the following text message from a new number: "Hey sheldon this is Kendal i use to

work for kmed im currently working for another pharmacy is there anyway you can send me a

application for tyler [Wholesale Rx]." About two months later, **SHELDON DOUNN** sent Lyons

an application for Wholesaler E, as well.

66.     On January 4, 2021, **SHELDON DOUNN** sent Courtney Rotenberry a text

message about another Houston-area pharmacy, warning her to "STAY AWAY.....if someone calls

the office hoping to catch someone off guard." **SHELDON DOUNN** continued, "This NA

[Pharmacy] could be a fraud too." In spite of that warning, **SHELDON DOUNN** continued to try to get NA Pharmacy Commonly Abused Prescription Drugs from both Wholesale Rx and Wholesaler E. Wholesaler E approved NA Pharmacy's application in late January 2021, about which **SHELDON DOUNN** exclaimed, "Yessssssss . . . . You have been set up at [Wholesaler E] !!!!" A short time later, Wholesale Rx approved NA Pharmacy to purchase, and, for a time, **SHELDON DOUNN** supplied NA Pharmacy with Commonly Abused Prescription Drugs from both Wholesaler E and Wholesale Rx .

67.     Kendal Lyons only wanted blue oxycodone 30 mg pills (the color preferred on the street). She refused to order oxycodone 30 mg from Wholesaler E when Wholesaler E only had yellow-colored pills. When blue oxycodone 30 mg pills came in stock in February 2021, **SHELDON DOUNN** reported, "Ok... The eagle has landed... tell me what you want." Lyons replied, "Narco oxy alpraz and prometh with cod."

68.     On April 8, 2021, Courtney Rotenberry sent **SHELDON DOUNN** a text message stating that "NA Pharmacy [is] being audit[ed] by [the] DEA," adding that "we cannot disclose to them, but their accounts are on hold until further notice."

69.     On April 13, 2021, **SHELDON DOUNN** called Kendal Lyons, and warned her that "[s]omething is up, because they [Wholesale Rx] won't let me sell you any control[led drugs] right now." Lyons responded, "At Tyler [Wholesale Rx]? Why not? Are we past our limit?" In spite of Courtney Rotenberry's warning not to disclose the DEA's investigation, **SHELDON DOUNN** read to Lyons from "the email I got from Courtney [Rotenberry]: 'We can't really disclose any info to them. So, at this point, let's avoid . . . selling them controls . . . 'til I get more info back from the DEA.'" After Lyons reminded **SHELDON DOUNN** that she was "not in [the] Houston [city limits]," **SHELDON DOUNN** replied, "As far as I know you're okay with [Wholesaler E]."

Lyons agreed, "[t]hat's what I was saying, and from everybody else too." **SHELDON DOUNN** responded, "Good, all right. So, we move to [Wholesaler E], that's what."

70.     NA Pharmacy purchased Commonly Abused Prescription Drugs from Wholesaler E through **SHELDON DOUNN** until May 25, 2021, when Wholesaler E sold NA Pharmacy 4,500 hydrocodone 10-325 mg pills and 6,500 oxycodone 30 mg pills. A few days later, NA Pharmacy sent the DEA a letter about retiring NA Pharmacy's registration as of May 28, 2021. On June 3, 2021, **SHELDON DOUNN**'s last text message to Griffin was, "Please don't stick me at [Wholesaler E]." Kendal Lyons never responded.

71.     All told, between February 5, 2021, and April 2, 2021, **SHELDON DOUNN** facilitated sales of 4,200 oxycodone 30 mg pills and 10,000 hydrocodone 10-325 mg pills from Wholesale Rx to NA Pharmacy. After Wholesale Rx ceased selling Commonly Abused Prescription Drugs to NA Pharmacy, **SHELDON DOUNN** facilitated sales to the pharmacy of thousands more oxycodone 30 mg and hydrocodone 10-325 mg pills from Wholesaler E.

## Neighborhood

72.     **SHELDON DOUNN** and Casey Kelleher, the operator of Neighborhood, joked about Neighborhood's preferences for certain colors of oxycodone 30 mg. According to Kelleher, a lot of "new people [were] requesting" a certain manufacturer. **SHELDON DOUNN** instructed Kelleher to tell the customers "to close their eyes and pretend i[t']s Actavis and swallow. [T]he EPIC or KVK work the same as Actavis." Kelleher responded, "There is a difference one day I'll tell you what the difference is we have a good enough relationship I'll let you in on the difference." **SHELDON DOUNN** responded, "Ok Deal."

73.     In December 2019, Kelleher told **SHELDON DOUNN** "I'll wait for the next shipment for kvk [which manufactured a blue oxycodone 30 mg pill]" to which **SHELDON**

DOUNN replied, "Ok.. our fingers and toes crossed we get before the end of the month"
SHELDON DOUNN continued, "Not a slam dunk. We were dry last December," to which
Kelleher responded, "If that's the case I'll just order everything I can now of what you have."
Kelleher added, "I can sell anything blue right now just can't get rid of white," to which
SHELDON DOUNN replied, "Might as well."

74.     From on or about March 22, 2018, through on or about August 2, 2021, more than
99% of the Schedule II controlled substances that Wholesaler D and Salus supplied Neighborhood
were oxycodone 30 mg and hydromorphone 8 mg—just two Commonly Abused Opioids, in one
strength apiece—as represented in the chart below:

**Commonly Abused Opioid Pills Wholesaler D and Wholesaler Salus Sold to Pharmacy Partnership dba Neighborhood Pharmacy, 2018 Through 2021**

|  | 2018 | 2019 | 2020 | 2021 | Total | % Total |
|---|---|---|---|---|---|---|
| Oxycodone 30 mg | 26,400 | 68,100 | 38,100 | 19,500 | 152,100 | 65% |
| Hydromorphone 8 mg | 8,000 | 54,600 | 12,800 | 3,600 | 79,000 | 34% |
| Other | 200 | 1,000 | 200 |  | 1,400 | 1% |
| Total | 34,600 | 123,700 | 51,100 | 23,100 | 232,500 | 100% |

## COUNT ONE
**Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute, Controlled Substances**
**(21 U.S.C. § 846, 21 U.S.C. § 841(a)(1))**

75.     The General Allegations section of this Indictment is re-alleged and incorporated
by reference as if fully set forth herein.

76.     From in or around 2015, and continuing through in or around February 2022, in the Southern District of Texas, and elsewhere, the defendant,

**SHELDON DOUNN,**

did knowingly and intentionally combine, conspire, confederate, and agree with Dick Osborne, Frank Nwabugwu, Keisha Harris, Andre Reid, Velencia Griffin, Kendal Lyons, and others, known and unknown to the Grand Jury, to distribute and dispense, and to possess with the intent to distribute and dispense, a controlled substance, in a manner that **SHELDON DOUNN** and his co-conspirators knew and intended was not authorized by law, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

77.     The controlled substances involved in this conspiracy attributable to the defendant are mixtures and substances containing detectable amounts of oxycodone and hydrocodone, Schedule II controlled substances, as well as other controlled substances, in violation of Title 21, United States Code, Section 841(b)(1)(C).

### Purpose of the Conspiracy

78.     It was the purpose and object of the conspiracy for **SHELDON DOUNN** and his co-conspirators to unlawfully enrich themselves by, among other things, distributing and causing to be distributed to Houston-area pill-mill pharmacies, from Wholesale Rx, controlled substances, in a manner not authorized by law.

### Manner and Means of the Conspiracy

The manner and means by which **SHELDON DOUNN** and his co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

79.     **SHELDON DOUNN** and his co-conspirators distributed and caused to be distributed controlled substances to Houston-area pill-mill pharmacies knowing and intending that

the pharmacies would and did distribute and dispense the drugs without valid prescriptions—*i.e.*, without prescriptions issued in the usual course of a professional practice for a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO
### Conspiracy to Defraud the United States
### (18 U.S.C. § 371)

80.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

81.     From in or around 2015, and continuing through in or around February 2022, in the Southern District of Texas, and elsewhere, the defendant,

**SHELDON DOUNN,**

did knowingly and intentionally combine, conspire, confederate, and agree with Dick Osborne, Courtney Rotenberry, and others, known and unknown to the Grand Jury, to defraud the United States by impairing, impeding, obstructing, and defeating through deceitful and dishonest means, the lawful government functions of the DEA in its administration and enforcement of the CSA and its implementing regulations.

### Purpose of the Conspiracy

82.     It was a purpose and object of the conspiracy for **SHELDON DOUNN** and his co-conspirators to unlawfully enrich themselves by, among other things, using deception to stay in business and off the DEA's radar, including by splitting large orders for Commonly Abused Opioids between multiple DEA Forms 222 and falsely representing to the DEA that Wholesale Rx performed meaningful due diligence on its Houston-area pharmacy customers when Wholesale Rx did not.

## **Manner and Means of the Conspiracy**

The manner and means by which **SHELDON DOUNN** and his co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

83.     **SHELDON DOUNN** and his co-conspirators directed and caused Wholesale Rx to break up orders for Schedule II controlled substances into multiple DEA Forms 222, to make it appear to the DEA and others that Wholesale Rx was not ordering as many Commonly Abused Opioids in one transaction as it actually was.

84.     **SHELDON DOUNN** and his co-conspirators falsely represented to the DEA that Wholesale Rx was following written policies and procedures for monitoring and reporting suspicious orders, when in fact Wholesale Rx ignored red flags in all its pharmacy customers' purchasing and dispensing, and Wholesale Rx never reported to the DEA any orders as suspicious.

85.     **SHELDON DOUNN** and his co-conspirators sought to disguise from the DEA that Wholesale Rx's pharmacy customers purchased the Commonly Abused Prescription Drugs to divert them, and that Wholesale Rx's Houston-area pharmacy customers:

   a.  Ordered and received non-controlled substances primarily as a means of avoiding detection by law enforcement of their aberrant controlled-substance ordering;

   b.  Mostly bought exactly the number of Commonly Abused Prescription Drugs Wholesale Rx would sell them each month;

   c.  Often split their orders onto multiple DEA Forms 222 to make it appear that the pharmacies were not ordering a large amount of the Commonly Abused Opioids in one transaction; and

   d.  Periodically submitted drug-usage reports that were fabricated or that reflected obvious red flags for diversion.

*Continued on next page…*

**Overt Acts**

86.     In furtherance of the conspiracy and to effect its illegal objects, **SHELDON DOUNN** and his co-conspirators committed the following overt acts, among others, in the Southern District of Texas, and elsewhere:

    a.   On or about February 21, 2019, **SHELDON DOUNN** annotated Wholesale Rx's Suspicious Order Monitoring specification:



    b.   On or about January 21, 2021, **SHELDON DOUNN**, Courtney Rotenberry, Dick Osborne, and others directed and caused Wholesaler Rx to split into two different DEA Forms 222, fraudulently dated five days apart, a large order from Supplier A, to hide from the DEA and others that Wholesaler Rx, in a single transaction, purchased such a large number of the Commonly Abused Opioids to sell to its pharmacy customers.

    c.   On or about May 5, 2021, **SHELDON DOUNN** instructed Kendal Lyons to split orders for hydrocodone and oxycodone between DEA Forms 222 to make the orders appear smaller, instead of ordering everything on the same form at the same time.

All in violation of Title 18, United States Code, Section 371.

## COUNTS THREE THROUGH FIVE
### Unauthorized Distribution of Schedule II Controlled Substances
### (21 U.S.C. § 841(a)(1) & (b)(1)(C) & 18 U.S.C. § 2)

87.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

88.     On or about the following dates, **SHELDON DOUNN** knowingly and intentionally distributed and dispensed, and caused to be distributed and dispensed, and aided and abetted the distribution and dispensing, in a manner not authorized by law, a detectable amount of the following Schedule II controlled substances:

| Count | On or about | Drug | Qty | Distributor | Pharmacy |
|---|---|---|---|---|---|
| 3 | October 2, 2019 | Oxycodone 30 mg | 700 | Wholesale Rx | K Med |
| 4 | October 7, 2019 | Hydrocodone 10-325 mg<br>Oxycodone 30 mg | 1,000<br>1,000 | Wholesale Rx | Aldine |
| 5 | Feb. 22, 2021 | Oxycodone 30 mg<br>Hydrocodone 10-325 mg | 600<br>2,000 | Wholesale Rx | NA Pharmacy |

Each in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

## COUNT SIX
### Conspiracy to Unlawfully Distribute and Dispense, and Possess with Intent to Distribute, Controlled Substances
### (21 U.S.C. § 846, 21 U.S.C. § 841(a)(1))

89.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

90.     From in or around 2018, and continuing through in or around February 2021, in the Southern District of Texas, and elsewhere, the defendant,

**SHELDON DOUNN,**

did knowingly and intentionally combine, conspire, confederate, and agree with members of Broker Group A, Broker Group B, Wholesaler D, Wholesaler E, Salus, Kendal Lyons, Casey Kelleher, and others, known and unknown to the Grand Jury, to distribute and dispense, and to

31

possess with the intent to distribute and dispense, a controlled substance, in a manner that **SHELDON DOUNN** and his co-conspirators knew and intended was not authorized by law, in violation of Title 21, United States Code, Section 841(a)(1); all in violation of Title 21, United States Code, Section 846.

91.     The controlled substances involved in this conspiracy attributable to the defendant are mixtures and substances containing detectable amounts of oxycodone and hydrocodone, Schedule II controlled substances, as well as other controlled substances, in violation of Title 21, United States Code, Section 841(b)(1)(C).

### Purpose of the Conspiracy

92.     It was the purpose and object of the conspiracy for **SHELDON DOUNN** and his co-conspirators to unlawfully enrich themselves by, among other things, distributing and causing to be distributed to Houston-area pill-mill pharmacies, from Wholesaler D, Wholesaler E, and Salus, controlled substances, in a manner not authorized by law.

### Manner and Means of the Conspiracy

The manner and means by which **SHELDON DOUNN** and his co-conspirators sought to accomplish the purpose and object of the conspiracy included, among other things:

93.     **SHELDON DOUNN** and his co-conspirators distributed and caused to be distributed controlled substances to Houston-area and Florida pill-mill pharmacies knowing and intending that the pharmacies would and did distribute and dispense the drugs without valid prescriptions—i.e., without prescriptions issued in the usual course of a professional practice for a legitimate medical purpose.

All in violation of Title 21, United States Code, Section 846.

## COUNTS SEVEN AND EIGHT
### Unauthorized Distribution of Schedule II Controlled Substances
### (21 U.S.C. § 841(a)(1) & (b)(1)(C) & 18 U.S.C. § 2)

94.     The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

95.     On or about the following dates, **SHELDON DOUNN** knowingly and intentionally distributed and dispensed, and caused to be distributed and dispensed, and aided and abetted the distribution and dispensing, in a manner not authorized by law, a detectable amount of the following Schedule II controlled substances:

| Count | On or about | Drug | Count | Distributor | Pharmacy |
|---|---|---|---|---|---|
| **7** | June 11, 2020 | Oxycodone 30 mg<br>Oxycodone 10-325 mg<br>Hydrocodone 10-325 mg<br>Hydromorphone 8 mg | 1,000<br>1,000<br>2,000<br>1,000 | Wholesaler E | K Med |
| **8** | April 20, 2021 | Oxycodone 30 mg<br>Hydrocodone 10-325 mg | 1,500<br>2,000 | Wholesaler E | NA Pharmacy |

Each in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), and Title 18, United States Code, Section 2.

## NOTICE OF CRIMINAL FORFEITURE
### (21 U.S.C. § 853)

96.     The allegations contained in Count 1 and Counts 3 through 8 of this Indictment are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to Title 21, United States Code, Section 853.

97.     Pursuant to Title 21, United States Code, Section 853, upon conviction of an offense in violation of Title 21, United States Code, Sections 841 and 846, the defendant,

**SHELDON DOUNN,**

shall forfeit to the United States of America any property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of such offenses and any property used, and

intended to be used, in any manner or part, to commit, or to facilitate the commission of, the offenses. The property to be forfeited includes, but is not limited to, the following:

    a.  Bank of America, Account No. **** **** 6031, in the name of PHARMACY RX CONSULTANTS LLC.

If any of the property described above, as a result of any act or omission of the Defendant:

    a.  cannot be located upon the exercise of due diligence;

    b.  has been transferred or sold to, or deposited with, a third party;

    c.  has been placed beyond the jurisdiction of the court;

    d.  has been substantially diminished in value; or

    d.  has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to a money judgment and forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p).

A TRUE BILL.

**Original Signature on File**

FOREPERSON

ALAMDAR S. HAMDANI
UNITED STATES ATTORNEY

GLENN S. LEON
CHIEF
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

BY: DREW PENNEBAKER
TRIAL ATTORNEY
FRAUD SECTION, CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

34